UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:06-CR-337 (CEJ) |
| ) | |
| GARY STEPHEN KAPLAN, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

Before the Court is the motion of defendant Gary Stephen Kaplan for review of a detention order. See 18 U.S.C. §3145(b).

On May 25, 2007, and June 4, 2007, hearings were held before United States Magistrate Judge Mary Ann L. Medler on the motion of the United States for pretrial detention of the defendant. On June 13, 2007, Judge Medler entered an order granting the government's motion and ordering the defendant detained pending trial. The defendant now moves for reconsideration of the order.

The order of detention of the magistrate judge is reviewed by the Court *de novo*. See United States v. Maull, 777 F.2d 1479, 1481-82 (8th Cir. 1985). In this regard, the Court conducted a further hearing on September 5, 2007. Having now reviewed the record of the proceedings in this case, the testimony (including affidavits) and exhibits presented at the hearings, and the arguments and memoranda of counsel, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. Defendant Gary Stephen Kaplan is 48 years old, married, and he has two minor children. Kaplan's wife and children presently live in St. Louis in a home they purchased

after Kaplan's arrest on March 28, 2007. According to Kaplan's counsel, the St. Louis residence is valued at $1.4 million.

2. Before his arrest, Kaplan had resided for nine years in Costa Rica. Before that, Kaplan had lived in Florida for five years, in the Dominican Republic for one year, and in Israel for approximately five months. Kaplan was born in the United States; when interviewed by a Pretrial Services officer, Kaplan stated that he is a citizen of the Dominican Republic and of Israel, and that he is a legal resident of Costa Rica.

Apart from the indictment, the recently-acquired residence is the only connection that Kaplan has to the community in this district. Kaplan's history of relocating from country to country establishes that he has no real ties to any community.

3. Kaplan operated BETonSPORTS.com from 1996 to 2004. Although Kaplan states that he is now retired, he states that he earns consulting fees of $1 million annually. Yet, Kaplan states that he does not maintain a bank account in his name. He has two residences in Costa Rica, one valued at $1 million and the other at $2 million, but they are in his wife's name. Six automobiles and five credit cards that he has access to are in the names of various companies.

4. It is not known to the Court whether title to the St. Louis home occupied by Kaplan's wife and children is in Kaplan's name. The attorneys for the defendant, however, state that the property is available as security for the defendant's release. Additionally, Kaplan's father-in-law, Warren Hoeffner testified that he would be willing to post real property located in Colorado and Florida, having a total value of almost $7 million, as security for the defendant's release.

5.  At the time of his arrest in the Dominican Republic on March 28, 2007, Kaplan was registered in a hotel under the name "Allen Andre Viaux." Five passports were found in his possession. Two of the passports were fraudulent in that they purported to have been issued by Peru and falsely stated Kaplan's place of birth as being Lima, Peru. One of the Peruvian passports reflected a false date of birth for Kaplan, and they each bore different names ("Gary Kaplan Pearlman" and "Meir Kaplan Pearlman"). Also, one of the passports bore a number that had been issued to a Peruvian woman. Attached to that passport was a fraudulent United States visa.

A United States passport found in Kaplan's possession contained a blank space where the issuee's Social Security number should have been entered. A passport purportedly issued from Israel bore the name "Meir (Gary Stephen) Kaplan" and a passport purportedly issued by the Dominican Republic bore the name "Gary Stephen Kaplan Pearlman."

Kaplan states in his declaration that the fraudulent Peruvian passports were "given" to him by an unnamed individual in South America, and that "it appears" that he used one of them when traveling from Argentina. Kaplan states that he "should never have accepted them or should have thrown them away when [he] received them." Curiously, he doesn't explain why the individual gave him the passports (the Court doubts that this is a South American custom), and he does not explain how the individual obtained the photographs and other personal information that appear on the passports. Additionally, Kaplan does not explain why he accepted and kept these gifts.

Kaplan also states in his declaration that the name "Meir" that appears on his Israeli passport is the Hebrew name that was given to him at birth. The name "Meir,"

however legitimate, is not one that Kaplan has used consistently. Also, there does not appear to be a religious basis for Kaplan's use of the other names that appear on his passports.

6. When Kaplan applied for a United States passport in 1998, he provided a Social Security number with the last four digits of "4820." The last four digits of Kaplan's Social Security number are, in fact, "2480." The transposition of digits in a Social Security number is a common technique used by criminals to conceal their true identity. Also, the transposition can be attributed to innocent mistake or clerical error, thus providing the criminal a legitimate explanation for using the incorrect number.

Kaplan states in his declaration that the transposition of the numbers was an innocent mistake, and that he often confused the last four digits of his Social Security number (2840) with the last four digits of his father's business phone number (4820). In her affidavit, the defendant's wife states that she believed that xxx-xx-4820, which appears on the defendant's income tax returns, was Kaplan's Social Security number. Mrs. Kaplan states that she obtained that number from the defendant's mother, who had made the same mistake, *i.e.*, she confused the defendant's Social Security number with a business phone number.

7. Apart from the names appearing on the passports, Kaplan has also used the name "Greg Champion." In his declaration, Kaplan states that in advertising materials, he represented that "Greg Champion" was the president and CEO of BetOnSports. He states that he didn't want his real name used in the company's advertising. Kaplan does not explain why he didn't want his real name to be associated with a business he that he believed was legitimate.

8. When he was arrested, Kaplan also had seven passport-type photos in his possession. Two of the photos are identical to those on the fraudulent Peruvian passports—--the passports Kaplan states were "given" to him. Kaplan describes these in his declaration as "file photos" that he maintained for use in other travel documents or identification documents he might need for his international business travel. The Court finds this explanation lacking in credibility. It is doubtful that keeping a supply of passport photos for future use is a common practice of business travelers. It is more likely a practice employed by individuals involved in the illegal manufacture of identification documents.

9. The evidence shows that the defendant has identified himself by a variety of names and that he has used more than one Social Security number in identifying himself. His explanations for these actions are not credible. Moreover, the evidence shows that Kaplan clearly has the means to obtain fraudulent identification documents. The defendant's conduct gives the Court no assurance that he would comply with a release condition that requiring him to surrender his passport(s) and prohibiting him from obtaining a new passport.

10. Kaplan admits that after he learned of the indictment, he did not surrender himself, choosing instead to take a vacation in the Dominican Republic. In his declaration, Kaplan states that he became frightened after the news of the indictment caused a $30 million "devaluation" of his stock and his assets were frozen. He also states that he feared unfair treatment by the prosecution. Nevertheless, Kaplan denies that he was a fugitive. Of course, the conduct he has admitted to shows the appropriateness of this appellation.

11.  A notebook found in Kaplan's possession when he was arrested contained his handwritten notes of an inquiry he made about obtaining asylum in Nicaragua. Kaplan states in his declaration that he made this inquiry to a lawyer in Costa Rica after the indictment was unsealed, but he chose not to relocate to Nicaragua. Instead, he traveled to the Dominican Republic where, as noted above, he registered in a hotel under a false name.

It is significant that Kaplan sought legal advice about asylum in Nicaragua after he learned of the indictment. Again, this conduct is indicative of his willingness to take measures to avoid the serious charges pending against him.

12. According to an FBI agent, Kaplan stated after his arrest that he felt he could avoid the charges against him by staying on the run. Kaplan states in his declaration that he considered not surrendering while his co-defendants' motions to dismiss were pending and while awaiting a favorable ruling by the World Trade Organization on an issue that he believes would affect this prosecution. Kaplan's statements provide further evidence of his intent to avoid confronting the charges against him.

13.  A handcuff key was found in the Kaplan's possession when he was arrested. Kaplan states that the key was given to him by an intermediary who helped secure his release from kidnapers in Venezuela. The kidnapers had been holding Kaplan handcuffed in the back of a vehicle. Whether the handcuff key was used to free Kaplan is unclear. If it was used for that purpose, then this incident represents an instance where Kaplan was able to obtain assistance in escaping.

14.  Kaplan's criminal history includes convictions for misdemeanor criminal impersonation of another with intent (1976), forgery of a credit card (1979), theft by use of

a credit card (1979), appropriating lost property (1979), misdemeanor disorderly conduct (1981), misdemeanor promoting gambling in the second degree (1983).

15. Kaplan reported that health conditions for which he takes medication. None of these conditions require hospitalization or other treatment that cannot be provided to him during incarceration. Additionally, Kaplan has a history of substance abuse.

16. In the indictment, Kaplan is accused of the following offenses: Count 1 - Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d); Count 2 - Mail Fraud, in violation of 18 U.S.C. § 1341; Counts 3-12 - Use of a Communications Facility to Transmit Bets and Betting Information, in violation of 18 U.S.C. §§ 1084 and 2; Count 13 - Interstate Transportation of Gambling Paraphernalia, in violation of 18 U.S.C. §§ 1953 and 2; Counts 14-16 - Tax Evasion, in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2; and Counts 17-22 - Interference with the Administration of Revenue Laws, in violation of 26 U.S.C. § 7212(a) and 18 U.S.C. § 2. The terms of imprisonment that may be imposed upon conviction for these offenses range from a maximum of two years to a maximum of twenty years. The total maximum term of imprisonment that may be imposed is eighty-three years. The penalties Kaplan faces provide a great incentive for flight.

The government is confident of the strength of its case against Kaplan. In its memorandum, the government describes the evidence it intends to present at trial, including statements made by Kaplan himself and testimony from individuals who dealt with him as the owner of BetOnSports.

17. The Court heard testimony from Tom Griffin, the operator of Griffin Personnel Group (GPG), a private security firm.

18. GPG was retained by Flood & Flood, the law firm that is representing Kaplan in this case, to develop a plan for providing security services at the Kaplan home in St. Louis in the event of Kaplan's release to house arrest. GPG considers Flood & Flood to be its client, not Kaplan. According to Mr. Griffin, GPG would not receive any funds or accept any instructions directly from Kaplan.

The proposal contemplates that payment for GPG's services would be made by Flood & Flood. Continued maintenance of the protective services could be made a condition of Kaplan's release. GPG prepared a "Preview of Capabilities" which consists of a proposal of the services it could provide. No actual plan had been developed by the time of the hearing on September 5, 2007.

19. GPG has had experience in providing protective services to a number of clients, domestically and internationally. According to the proposal it submitted to Flood & Flood, "[t]he majority of GPG's assignments involve death threats against executives or a significant threat to the life of an enterprise." In providing its services, GPG uses active, commissioned police officers who are available at all hours of the day and night.

20. GPG has had no experience in long-term criminal confinement or in ensuring a defendant's attendance at court proceedings.

21. For the services in this case, GPG proposes to provide three police officers stationed corners of the residence and a fourth officer who would be assigned to a monitoring station in the garage. There would be no visual surveillance of Kaplan inside the residence.

GPG would also provide a "perimeter protection system", such as motion detectors and monitored alarms, that would be triggered by anyone leaving or entering the property.

This service would be coupled with other conditions imposed by the Court, such as GPS monitoring and restrictions on cell phone and land-line phone usage.

22. The officers would be able to respond if there was a breach of the perimeter, such as would occur if a door or window were opened by Kaplan or another occupant of the residence. They would then check to make sure that Kaplan was still inside the residence and confirm that the opening was for a legitimate purpose.

23. Mr. Griffin was asked how the officers would respond if they heard an alarm or received some other report indicating that the perimeter had been breached. He testified that the officers would first go to the door of the residence and demand to see Kaplan. If it determined that Kaplan is not there, then a call would be made to the St. Louis Police Department to report his escape.

24. Mr. Griffin testified that GPG had not developed a protocol that would be implemented in the event that an emergency arose at the residence. There is no procedure in place to address Kaplan's or any other occupant's need for emergency medical assistance or to address a fire at the residence. Additionally, Mr. Griffin testified that he did not expect that GPG would be responsible for escorting Kaplan to any location outside his residence.

25. GPG, along with another firm, would also provide monitoring of land-line phone communications to and from the Kaplan residence. Also, a device could be used to detect incoming and outgoing cell phone communications.

26. The proposed security system is in one sense pro-active. However, once a breach occurs, the officers would be in a reactive mode. Notwithstanding the number of

cameras, motion detectors and alarms, if Kaplan left the house, the law officers on site could do little more than report his escape.

27. The testimony and information presented at the hearing have not allayed the concerns expressed by the Court on the record about the adequacy of the defendant's home detention proposal. The defense allowed GPG only twenty-four hours to prepare a proposal. The defense did not present a fully-developed plan for the Court's consideration.

28. The United States Marshals Service has expressed its opposition to the defendant's home detention proposal. According to Assistant Chief Deputy Leroy Messmer, the proposal "leaves the security of the defendant in the hands of those indebted to the defendant and subject to a monetary incentive to release him." This is the same concern expressed by the Court during the hearing.

However, the testimony of Mr. Griffin as to the qualifications and integrity of the law enforcement officers who would provide the security detail has addressed this concern.

## CONCLUSIONS OF LAW

The Bail Reform Act, 18 U.S.C. § 3141, *et seq.*, mandates that a person be released pending trial, "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). In the instant case, the government does not contend that Kaplan would pose a danger to any person or the community if he is released. Instead, it is the government's contention that Kaplan poses a risk of flight such that there is no condition or combination of conditions of release that would reasonably assure his appearance as required. The government bears the burden of proving this

contention by clear and convincing evidence. See United States v. Orta, 760 F.2d 887 (8th Cir. 1985).

After giving consideration to the factors set forth in 18 U.S.C. § 3142(g), the Court concludes that the government has met its burden of proof.

There is no doubt that Kaplan presents a serious risk of flight if he is released. Indeed, as discussed above, Kaplan has shown himself to be extremely resourceful in masking his true identity, and he has the financial wherewithal and the contacts to enable him to leave the jurisdiction or the country. After learning of the indictment, Kaplan was intent on avoiding the charges for as long as he could. Since his arrest, he has made statements wholly lacking in credibility in an effort to regain his freedom.

This Court, therefore, concludes that there is no condition or combination of conditions of release that would reasonable assure the defendant's appearance as required. Accordingly,

IT IS HEREBY ORDERED that the motion of defendant Gary Stephen Kaplan to revoke the detention order entered on June 13, 2007 [Doc. #399] is **denied**.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 28th day of September, 2007.